**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. ___20-MJ-03308-TORRES___

UNITED STATES OF AMERICA

v.

ASISCLO VALLADARES URRUELA,

Defendant.
_____/

**CRIMINAL COVER SHEET**

1.  Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)?     _ _Yes _ ✓ No

2.  Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?  ___ Yes ✓ No

3.  Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?  ___ Yes ✓ No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

BY:   *Walter M. Norkin*
_____

Walter N. Norkin
ASSISTANT UNITED STATES ATTORNEY
District Court No. 5502189
99 N.E. 4th Street
Miami, FL 33172
Tel:       305-961-9406
Fax:       N/A
Email:    walter.norkin@usdoj.gov

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No.  20-MJ-03308-TORRES |
| ASISCLO VALLADARES URRUELA, | ) |
| | ) |
| | ) |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___January 2014 to December 2018___ in the county of ___Miami-Dade___ in the ___Southern___ District of ___Florida___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, U.S.C., Section 1956(h) | Conspiracy to commit money laundering |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

ID #21904

_____
*Complainant's signature*

Paul J. West, Special Agent, FBI
*Printed name and title*

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by ___Telephone___

Date: **Aug 5, 2020**

_____
*Judge's signature*

City and state: ___Miami, Florida___

The Hon. Edwin G. Torres, U.S. Magistrate Judge
*Printed name and title*

## **AFFIDAVIT**

I, PAUL J. WEST, Special Agent with the Federal Bureau of Investigation (FBI), having been first duly sworn, do hereby depose and state as follows:

### **INTRODUCTION**

1.      I submit this application in furtherance of an investigation worked by FBI with the United States Drug Enforcement Administration (DEA).

2.      As a Special Agent with FBI, I perform the duties provided by law and regulation, and I am empowered to conduct investigations of offenses against the United States.

3.      I have been employed as a Special Agent with FBI since approximately January 2008.  As a Special Agent, I am responsible for investigations of offenses under Titles 18 and 21 of the United States Code, including those that focus on unlawful money laundering and other financial crimes.  I am currently assigned to a squad that is responsible for conducting investigations that target International Drug Trafficking Organizations.  Since October of 2008, I have been working on federal narcotics investigations and have participated in several investigations which led to the arrest and conviction of narcotics distributors.  Since 2008, I have received training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, narcotics, white collar crimes, search warrant applications, and various other crimes.  In the course of my training and experience, I have become familiar with the methods and techniques associated with the manufacturing, importation, and distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies, as well as the methods in which the payment and laundering of illicit proceeds are conducted.  In the course of conducting these investigations, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; supporting

1

and conducting undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification systems data; conducting court-authorized electronic surveillance; and preparing and executing search warrants that have led to the substantial seizures of narcotics, money, firearms, and other contraband.

4.      This affidavit is made in support of a criminal complaint charging ASISCLO VALLADARES URRUELA (hereinafter "VALLADARES") with conspiracy to commit money laundering, in violation of Title 18, United States Code, Sections 1956(h).

5.      Although I am familiar with the full breadth of the facts and circumstances of this investigation, I have not included in the affidavit each and every fact known to me, but only those facts and circumstances that I believe are sufficient to establish probable cause.

6.      The statements contained in this affidavit are based on my investigation, information provided by others, and on my experience and training as a federal agent and that of other agents participating in the investigation, including agents of the DEA.

## PROBABLE CAUSE

I.      **Background of the Investigation**

7.      In 2013, the FBI and DEA were investigating multiple Drug Trafficking Organizations ("DTOs") entrenched in Guatemala.  Guatemala is a strategically important country for large-scale DTOs because it is a trans-shipment point for a cocaine trafficking pipeline that goes from Colombia to Mexico, before branching off to various locations within the United States. Cocaine that originates in Colombia is often transported to Guatemala before it is re-sold or moved further north into Mexico, where cartels are charged with importing the cocaine into the U.S.  Thus, Colombian and Mexican organizations, hoping to minimize exposure to U.S. law enforcement,

buy and sell multi-ton quantities of cocaine in Guatemala and this, in turn, creates a market place of opportunities for Guatemalan DTOs, who act as middle-men receiving and re-selling multi-ton quantities of cocaine.

8.      This market place also generates and utilizes a substantial amount of cash. Through my experience, I have learned that to be successful, a DTO needs to obtain cash to further their trafficking plans (for example to pay for drug supplies, transportation costs and bribes of law enforcement officials). Furthermore, a successful DTO has to have the ability to move the cash clandestinely and to launder the cash profits once drug sales occur in order to reap the benefits of the unlawful trade.

9.      All this cash, in turn, additionally creates opportunities for other criminals to exploit and thus supports criminal activities incidental to the drug trade, including money laundering and corruption. While the movement of money and money laundering can be achieved through unsophisticated means, the most successful DTOs find ways to enlist legitimate or seemingly legitimate businesses into their schemes, including through "mirror transactions." [1] Banks in

---

[1] Based on my training, experience and knowledge of this investigation, I know that a "Mirror Exchange" is a form of black market currency transaction that takes place outside the ambit of banking institutions. In a mirror exchange, currency is delivered to an individual in one country and currency of an equal value is issued to an individual in a different country. The currency that is originally delivered does not actually move countries but is instead exchanged through an agreement between individuals who are part of the same underground money movement network. Often times, these agreements are made utilizing third parties who are not privy to the original illicit transaction, though these third parties understand that their involvement in making or receiving payment is part of some kind of unlawful scheme. For example, the original agreement may be for one drug trafficker (Trafficker A in Country A) to pay a second drug trafficker (Trafficker B in Country B). However, with the help of an intermediary, Trafficker A provides money to a third party entity (Company A in Country A, purportedly a legitimate business which has an outstanding account receivable due from Company B in Country B). Company A then contacts Company B to instruct Company B to pay the debt not to Company A but to Trafficker B in Country B. In this manner, though no currency has moved from Country A to Country B, Trafficker A still managed to pay Trafficker by using a mirror transaction involving third parties.

3

particular are prized targets of DTOs and the ability to move or launder money with the help of a banking institution represents not only an achievement for a DTO but the pinnacle of bad confluences – drug trafficking, corruption and bank involvement – that can seriously plague a country otherwise battling narcotics trafficking.

10.     Though not themselves narcotics traffickers, individuals engaged in corruption and the associated money laundering of proceeds unlawfully obtained through corruption are enablers of the drug trade because the cash required and generated from those other unlawful activities provides liquidity for drug traffickers, as well as providing a sophisticated way for drug traffickers to hide their illegal cash and money movements.  This investigation has uncovered just such a scheme, with VALLADARES acting as the enabler.

## II.     The Identification and Investigation of VALLADARES's Involvement in Money Laundering, and the Related Intersection of Narcotics Trafficking and Corruption

### A.     Overview of the Investigation's Conclusions

11.     In summary, this investigation revealed that there was a flow of money through a number of shell companies, assisted by a Guatemalan bank, and the money was used, on the one side, by VALLADARES to bribe politicians in Guatemala.  On the other side, it was returned to co-conspirators, some of whom are now cooperating witnesses ("CWs"), as "clean" money that the co-conspirators could freely spend or as cash in another location to support additional unlawful activities, such as narcotics trafficking.  VALLADARES and his co-conspirators had purportedly legal sources of income but needed to convert it into untraceable cash, with no paper trail linking them to the cash, that could be used for bribes.  CW-1, who worked at a bank, agreed to assist VALLADERS in this endeavor.  The illegal cash came primarily from two sources: a corrupt politician (hereinafter "Co-Conspirator 1" or "CC-1") and a narcotics trafficker (hereinafter "CW-

4

2"), who is presently incarcerated in the United States, having pled guilty to narcotics trafficking.[2] Both CC-1 and CW-2 provided cash to hide their unlawful activities and for the purpose of it being laundered with CW-1's assistance. Some of the money that was laundered ended up passing through banks in the U.S. and was assisted by companies in Miami, among other places in the U.S., before the cash was ultimately provided to VALLADARES. The conspiracy lasted from 2014 to 2018 and resulted in the laundering of over $9.5 million.

| VALLADARES and co-conspirators provide "clean" funds (that need to be converted into untraceable cash for bribes), purportedly to buy shares in a company. | VALLADARES receives untraceable cash back, minus a percentage. |
|---|---|

CW-1 charges a percentage from VALLADARES, CC-1 and CW-2, in exchange for either giving them "clean" money back or untraceable cash.

CW-1 takes cash from those who have it (CC-1, CW-2 and others), provides it to those who need it (VALLADARES and CW-2) – all done by purported investments in companies that provide returns.

| CC-1 provides "dirty" cash obtained from corruption, purportedly to buy shares in a company.<br><br>CW-2 provides "dirty" cash that he obtained from drug trafficking. | CC-1 receives "clean" money back via checks, minus a percentage.<br><br>CW-2 gets some "clean" money back via checks to make seemingly legitimate purchases and gets other money placed in locations to further narcotics trafficking, minus a percentage. |
|---|---|

---

[2] A third source of the money was another narcotics trafficker who was similarly prosecuted in the United States and pled guilty to that conduct. This affidavit does not discuss that trafficker in as great detail in order to provide a concise explanation of the scheme.

**B.      Information from CW-1 and Evidence Related to CW-1's Statements**

**i.       Information from CW-1**

12.      During the course of the investigation, agents debriefed a cooperating witness (hereinafter "CW-1"), who has pled guilty to money laundering charges and is cooperating in the hopes of receiving a more lenient sentence. CW-1 stated, in sum and substance, that CW-1 met VALLADARES in 2014 or 2015 through other co-conspirators in the money laundering scheme. At their initial meeting, VALLADARES explained to CW-1 that he needed cash, a substantial amount in large bills provided on a weekly or bi-weekly basis, and needed that cash not to be traceable to VALLADARES or his co-conspirators. VALLADARES added that he was previously getting the cash from another source but that situation had become problematic, which was why VALLADARES was now asking CW-1. CW-1 understood from this conversation, though it was not explicitly said, that VALLADARES wanted the cash to pay bribes. (As noted below, this understanding by CW-1 was confirmed by later events.) CW-1 informed VALLADARES, in sum and substance, that the type, amount, and interval of delivery of cash he was seeking, without any paper trail, could not come from a bank and instead had to be obtained from unlawful sources such as narcotics trafficking or corruption, though CW-1 could use a bank to make the cash appear legitimate.[3] VALLADARES responded, in sum and substance, that he was not concerned where

_____

[3] Based on my training, experience and knowledge of this investigation, I know that CW-1's representation that such cash could not come from a bank is accurate. Most commercial banks do not have large amounts of cash stored in their vaults, much less large amounts of cash that can be given away regularly to customers. Banking regulations require banks to store a certain percentage of their receipts as cash so that there is not a "run" on the bank when people want to make normal withdrawals. But this is not a large amount and it is not meant for withdrawal beyond the normal course – not the kind of amount or withdrawal VALLADARES was seeking. Moreover, if a bank had a need for a large amount of cash (beyond the reserve), there are effectively two ways to get the cash: either from normal receipts of customers or from a central or reserve bank. Both of these methods create a paper trail. So it would be known if a bank received an influx of cash (and then

the cash came from as long as it was not traceable to him once he received it from CW-1.  CW-1 then replied to VALLADARES that it could be done but CW-1 needed to make some arrangements.

13.     Coincidentally, several weeks before this meeting with VALLADARES, CW-1 had met with other co-conspirators and learned that some of the co-conspirators had a lot of cash that needed to be laundered.  CW-1's understanding from the co-conspirators was that the majority of that cash belonged to a politician, CC-1, who had obtained the money through corruption.  With one party needing cash (VALLADARES) and one party possessing cash (CC-1), CW-1 composed a plan.  CW-1, with the assistance of the machinery of the bank at which CW-1 was employed, would take the cash and issue to CC-1 and other co-conspirators shares in a corporation with a guaranteed return on the "investment."  CW-1 and other co-conspirators would take a percentage of the money supplied by CC-1 in exchange for CC-1 receiving laundered money in return.

14.     On the other side of the plan, VALLADARES and his co-conspirators too would purportedly purchase shares of a corporation, investing money that could be traced to VALLADARES and his co-conspirators but would show only that they purchased shares.  In return, VALLADARES and the companies he controlled would get some money back as checks issued from corporate earnings achieved through his investment, while getting other money delivered as untraceable cash.  CW-1 and other co-conspirators would take a percentage of this money as well, as part of the scheme.  VALLADARES agreed to this plan, and thus the scheme began operating with CW-1's assistance in approximately 2015.

---

gave it out).  The banking regime in Guatemala is sophisticated and similar to the U.S. regime, including having requirements to report large cash transactions and suspicious activities.

15.     CW-1 explained, in meetings with agents, that CW-1 would deliver cash directly to either VALLADARES or to one close associate of VALLADARES.   CW-1 personally supervised the money deliveries and in each instance, over the course of approximately four years, multiple times a month, CW-1 observed VALLADARES or his close associate receive the money.

16.     CW-1 stated that a variety of bags, briefcases and boxes holding cash were used for the deliveries.   Sometimes the cash was in a duffel bag, suitcase or backpack.   During holiday season, cash was delivered clandestinely in boxes of liquor designed to look like holiday gifts. Below are pictures from a search performed by authorities in Guatemala in their investigation of corruption.  The pictures were published in a report that is available on the internet.[4]  The pictures show bags similar to what CW-1 described and, when CW-1 was shown these photographs (pictured below), CW-1 stated that the two blue backpacks and the black Puma duffel bag were his/her bags of cash that he/she provided to VALLADARES.



---

[4]   A United Nations watchdog agency operating in Guatemala, the International Commission Against Impunity in Guatemala (with Spanish language abbreviation "CICIG"), issued a report outlining alleged bribery payments to the Guatemalan Congress.  These pictures were copied from that report.

17.     CW-1 further explained that, in making cash deliveries to VALLADARES, CW-1 would often see Guatemalan political figures waiting inside.  Sometimes CW-1 would see these political figures leave a meeting with VALLADARES carrying the exact bag that CW-1 had just dropped off.  The cash deliveries to VALLADARES were so rapid and so frequent, with such a strong demand for cash, that at one point VALLADARES apologized to CW-1 for all the effort the scheme was taking, stating something to the effect of, "Sorry; these politicians must think that money grows on trees."

18.     The money laundering scheme was very effective.  However, the cash that CC-1 needed laundered from political corruption eventually ran out.  All the money CC-1 needed laundered had been "cleaned" and the co-conspirators, including VALLADARES, needed new sources of cash to continue the scheme.  VALLADARES still had a need to bribe politicians.  It was at this point that cash from narcotics traffickers entered the scheme.

19.     During multiple conversations at their many meetings, CW-1 told VALLADARES explicitly that the money was coming from narcotics traffickers, noting that it was in U.S. dollars, and asked if VALLADARES would accept that form of currency, as it was easier and faster to hand that over rather than first converting the dollars to Quetzales.  VALLADARES did not flinch at being reminded that the cash was coming from narcotics trafficking but told CW-1 that he needed the currency to be in Quetzales for his purposes (namely, bribes of Guatemalan politicians).

20.     In or about 2016, CW-1 met CW-2 and, as their friendship grew, CW-2 confided to CW-1 that CW-2 was involved in narcotics trafficking.[5]  CW-2 and CW-1 recognized that they

_____

[5] CW-2 was not the first or only narcotics trafficker whose money entered the scheme.  However, this affidavit focuses on CW-2 to provide a concise explanation of the scheme and because some of the funds attributed to CW-2 passed through U.S. bank accounts, as discussed in more detail below.

9

could help each other, with CW-2 possessing cash and CW-1 working at a bank.  CW-2 needed money laundered for two purposes.  First, CW-2 wanted to purchase a house for approximately $1 million and needed the funds for the purchase to appear legitimately earned.  Second, CW-2 wanted to clandestinely move cash from Guatemala to points in South America to pay narcotics trafficking associates for prior drug sales and to make additional purchases of drugs.

21.     CW-1 agreed to help CW-2 in both endeavors.  Thus, CW-1 took cash from CW-2 and caused checks to be issued, which checks allowed CW-2 to buy the property.  CW-1 also took cash from CW-2 in Guatemala and, using mirror transactions with third parties, caused cash to be paid out in parts of South America as designated by CW-2.  CW-1 kept a percentage of cash that CW-2 provided as payment for the services CW-1 rendered, and used the remainder of that cash to continue supplying VALLADARES with the untraceable cash that he required for bribery.

22.     CW-1, during debriefs with agents, stated that the mirror transactions to cause cash to be paid out in South America was accomplished using, among other things, two companies in Miami and bank accounts in the U.S.  These two companies did business in the South American locations where CW-2 wanted the cash moved and thus were enlisted to participate in the scheme. CW-1 recalled that approximately $500,000 was laundered this way.

23.     CW-1 added that the last cash delivery to VALLADARES took place around the holidays in December 2018.  That money was delivered in a liquor box made to look like a holiday gift of spirits rather than bulk cash.  CW-1 estimates that, over the course of the conspiracy, over $9.5 million was provided to VALLADARES as part of the scheme.

      **ii.      Corroborating Documents in Addition to the Pictures of Bags**

24.     Law enforcement has obtained a variety of documents that corroborate the information provided by CW-1.  These documents show, among other things, VALLADARES's

10

purchase of shares in 2015, which allowed VALLADARES to provide money from him and companies controlled by him to CW-1 and companies controlled by CW-1. Notably, CW-1 and VALLADARES did take some steps to distance themselves from the transactions, including by having "corporate officers" of those companies sign some of the documents. These individuals were effectively straw owners of the corporations. However, VALLADARES's name and signature do appear on some of the documents and provide important proof of the money exchange, consistent with the statements of CW-1.

25.     In addition, law enforcement obtained documents showing the issuance of checks and the title transfer corroborating CW-1's information about using illegal narcotics trafficking proceeds from CW-2 to help CW-2 purchase property and at the same time provide untraceable cash to VALLADARES.

26.     Moreover, law enforcement obtained banking documents tracing money flow during the time of the scheme. There were four transactions in particular that highlighted the veracity of CW-1's information. In December 2017, bank documents show VALLADARES utilized an account held under his name with a U.S. bank to transfer approximately $350,000 to another U.S. bank account held by a Miami-based company (hereinafter "Company A"). The note accompanying that transfer referenced a company controlled by CW-1 (hereinafter "Company B"). Later that month, records show Company B transferred another sum of money to a Delaware corporation. Then, in January 2018, Company B again transferred a sum of money, this time again to Company A in the Miami area. Later in January, Company B made another transfer of money to a second Miami-based company. These four money transfers in December 2017 and January 2018 amount to approximately $500,000, consistent with CW-1's explanation of events. Furthermore, these transfer show the co-conspirators' use of U.S. banks and Miami-based

11

companies to further their scheme, as well as VALLADARES's knowledge of both the scheme and the use of U.S. banks and companies.

### C. Information from CW-2 and Evidence Related to CW-2's Statements

27. Agents also debriefed another cooperating witness ("CW-2"), who pled guilty to narcotics trafficking and is cooperating in the hopes of receiving a more lenient sentence. CW-2 stated, in sum and substance, that on multiple occasions in or about 2017 and 2018, CW-2 utilized CW-1 to move narcotics trafficking proceeds in a clandestine way in order for CW-2 to be able to continue drug trafficking. CW-2 explained that, as part of drug trafficking operations, it was necessary to move bulk cash from Central America to South America. The cash was the proceeds of narcotics trafficking and the movement was done to pay other traffickers who had supplied hundreds of kilograms of cocaine or otherwise assisted in dispatching it north to Central America, as well as to support those traffickers in the planning and coordination of additional future shipments of cocaine. Furthermore, it was necessary to move the money in a way that hid the fact that it was proceeds of illegal activity, and to conceal the true identities of the sending and receiving persons. CW-1, as a banker, was able to provide the service, taking the cash in Guatemala and having it delivered to individuals in South America. CW-2 stated that CW-1 was aware that CW-2 was a narcotics trafficker and that the cash was proceeds of narcotics trafficking because CW-2 talked openly to other narcotics co-conspirators about their ongoing drug activities in front of CW-1 and CW-2 and CW-1 had conversations about the need to move the money in a clandestine way without creating a paper trail.

28. As part of CW-2's drug trafficking operations, CW-2 maintained a computerized ledger detailing, among other things, the movement of money that supported his drug operations. CW-2 furnished the ledger to agents. The ledger showed dates that money was provided to CW-

1, as well as sums that were moved and the fees that were charged for the movement.  The ledger, which specifically listed CW-1 on multiple occasions, confirmed both CW-2's and CW-1's statements about laundering $500,000 in U.S. currency in December 2017 and January 2018.  The ledger also matched the bank documents law enforcement had obtained showing the movement of $500,000 with U.S. banks and Miami-based companies.

**D.      Information from CW-3 and Evidence Related to CW-3's Statements**

29.      During the course of the investigation, agents also debriefed a third cooperating witness (hereinafter "CW-3").  CW-3 pled guilty to money laundering (with narcotics trafficking as the underlying crime) and is cooperating in the hopes of receiving a more lenient sentence.  CW-3 stated, in sum and substance, that CW-3 met VALLADARES in approximately 2012.  At the time, CW-3 was involved in politics in Guatemala.  VALLADARES expressed an interest in supporting CW-3 and the political party to which CW-3 belonged and, several weeks after their initial meeting, VALLADARES came to CW-3 with a bag of cash.  CW-3 saw the bag contained Quetzales.  CW-3 told agents that VALLADARES noted this cash was for all the elected party members to share and CW-3 estimated that the cash amounted to approximately $1,500 per person.  CW-3 explained that he/she did not want to personally handle the cash and directed VALLADARES to take it to another location where a different party member would accept it.

30.      CW-3 stated that, approximately one month later, VALLADARES again came to CW-3 with a similar bag of cash.  CW-3 again directed VALLADARES to take the cash to a different location.  CW-3 explained that, from then on, in discussing the matter with other party members, CW-3's understanding was that VALLADARES was making monthly bulk cash deliveries and that members of the party were each receiving approximately $1,500 from each

13

delivery. CW-3 added that there was some tension during the discussions because it was understood that members of other parties were getting larger amounts.

31.     In 2014, CW-3 had another meeting with VALLADARES where VALLADARES expressed interest in providing more support and directly to CW-3. CW-3 and VALLADARES discussed whether money could be put into certain bank accounts and VALLADARES explained to CW-3 that VALLADARES did not want to put money into accounts, preferring instead to deal in cash, because VALLADARES did not want the money to be traced back to him. Thus, CW-3 agreed that the money would be accepted as cash. Thereafter, on a monthly basis through 2015, VALLADARES would either drop off bulk cash with CW-3 or designate a pick up spot for the cash. CW-3 remembered seeing the money being delivered in blue, waterproof-type bags.

32.     CW-3 was shown the photographs (pictured previously above) of bags seized during the investigation by law enforcement authorities in Guatemala and CW-3 identified the two blue bags (one dark blue and one light blue) pictured as being the types of bags that CW-3 saw VALLADARES delivering. CW-3 estimated that, in 2015 alone, VALLADARES provided approximately 18 million Quetzales (equivalent to approximately $2.5 million U.S. dollars) to support CW-3 and CW-3's political goals.

33.     CW-3 explained that, in that time period, Congress was writing a new telecommunications law. The law that was ultimately passed had a number of requirements for a cellular telephone company that wanted to operate in Guatemala and the result was that only one telephone company fit the requirements, which effectively secured a monopoly for that company through the bribes paid by VALLADARES and his co-conspirators.

**CONCLUSION**

Based upon the information provided above, I respectfully submit that probable cause exists to believe that from in or around January 2014 and continuing to December 2018, ASISCLO VALLADARES URRUELA, and others conspired, all in violation of Title 18, United States Code, Section 1956(h); to:

(a)     knowingly conduct financial transactions affecting interstate and foreign commerce, which transaction involved the proceeds of specified unlawful activity, to wit: narcotics trafficking and violation of a foreign law, specifically bribery, knowing the funds involved in the transactions represented the proceeds of some form of unlawful activity, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location source, ownership and control of the proceeds of the specified unlawful activity, in violation of Title 18, United States Code, Section1956(a)(1)(B)(i);

(b)     knowingly transport, transmit and transfer funds from a place in the United States to or through a place outside the United States and to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: violation of a foreign law, specifically bribery, in violation of Title 18, United States Code, Section1956(a)(2)(A);

(c)     knowingly transport, transmit and transfer funds from a place in the United States to or through a place outside the United States and to a place in the United States from or through a place outside the United States, knowing the funds involved in the transportation, transmission, and transfer represented the proceeds of some form

15

of unlawful activity, and knowing that the transportation, transmission, and transfer were designed in whole and in part to conceal and disguise the nature, location source, ownership and control of the proceeds of the specified unlawful activity, in violation of Title 18, United States Code, Section1956(a)(2)(B); and

(d)     knowingly engage in a monetary transaction affecting interstate and foreign commerce, by, through and to a financial institution, in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, to wit: narcotics trafficking and violation of a foreign law, specifically bribery, in violation of Title 18, United States Code, Section1957.

Respectfully submitted,

ID #21904

PAUL J. WEST, SPECIAL AGENT,
FEDERAL BUREAU OF INVESTIGATION

Attested to by the Applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Telephone this 5 day of August 2020.

THE HON. EDWIN G. TORRES
UNITED STATES MAGISTRATE JUDGE

16

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**PENALTY SHEET**

**Defendant's Name**: ASISCLO VALLADARES URRUELA

**Case No:**

Count #:  1

Conspiracy to commit money laundering

Title 18, United States Code, Section 1956(h)

*Max. Penalty:  20 Years' Imprisonment

\* **Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**